Good morning, and may it please the court. May I proceed? Good morning, and may it please the court. Jonathan Siderbaum for the petitioner Everardo Hernandez Ruiz. Mr. Hernandez, an unrepresented, mentally incompetent, lawful permanent resident who lived in this country from the age of 12, was held to be inadmissible based on a conviction for a felony crime of moral turpitude. His removal should be reversed for two independent reasons. First, the immigration judge relied on legally inadequate evidence in finding that the wobbler offense of which Mr. Hernandez had been convicted was a felony rather than a misdemeanor. Second, Mr. Hernandez was deprived of a fair hearing because in the face of his apparent mental incompetence, the immigration judge failed to provide him with assistance or, at a minimum, to inquire further into his mental capacities. As to the disqualifying conviction, the government bore the burden of proving that the penalty for that offense was either the maximum penalty for that offense was either greater than a year or the actual sentence was greater than six months. As the government concedes in its brief, in effect, the materials upon which the immigration judge relied in making that determination were inadequate to carry that burden. As to the actual sentence, the government alleged and the immigration judge found that Mr. Hernandez Ruiz was sentenced to six months in jail. Thus, the immigration judge's finding of admissibility could not have rested on the actual sentence. Instead, it must have rested on the possible sentence. With respect to the possible sentence for the offense, the immigration judge rested his decision on two things. First, the statutory text of the relevant section of the California Penal Code, 273.5. And second, a notation on a criminal history printout of an F for felony. With respect to the statutory text, that was legally inadequate because, again, as the government appears to recognize, the offense here is a wobbler offense that can be either a misdemeanor or a felony depending on how it is sentenced in the California system. And thus, the text of the statute does not by itself distinguish between the two offenses. With respect to the notations on the criminal history printout, those were also inadequate. As this Court recognized in Olivera Ferreira v. Ashcroft, an F for a felony notation, again, by itself, with respect to a wobbler offense, is ambiguous because under California law, an offense that may be charged as a felony like this may, as a matter of law, become a misdemeanor when the sentence imposed is not one in state prison. This Court's decision in United States v. Bridgeforth, which is 441F3-864, reviews a number of the decisions that this Court has handed down, looking at wobbler offenses, both under the immigration statutes and in the criminal context, and explains that this Court consistently has looked to the treatment of the offenses under California law and has taken into account whether the offense is indeed a misdemeanor or a felony for purposes of California law. So, in that respect, both of the things, both of the pieces of evidence upon which the immigration judge relied here were inadequate as a matter of law. As to the second claim, the fairness of the hearing that Mr. Hernandez received, we believe that there is abundant evidence in the transcript of the hearing to show that Mr. Hernandez completely lacked the ability to understand the proceedings that were going on. He persistently failed to comprehend the charges against him, despite reading the transcript. He blurted out, at one point, inappropriate remarks to the courtroom clerk and had to be admonished for no apparent reason. Even when, eventually, the immigration judge was able to elicit from him one-word responses to certain yes-or-no questions, the immigration judge was only able to do that again after repeated labored attempts. As the immigration judge said after, at the end of the first of the six hearings that were required to reach a result in this case, the immigration judge said, after trying to explain the charges to Mr. Hernandez repeatedly, and this is a quote from Administrative Record, pages 106, 107, you told me repeatedly you don't understand why it is that you're here in court. I've tried to explain that to you, but we haven't been able to get past square one. Frankly, I don't know if the charge is a correct one or not, because you keep telling me you don't understand why it is that you're here. Those sorts of exchanges occur again and again in the course of the transcript. In the face of that evidence of mental incapacity, we believe that both under the statutes and regulations, and under the Due Process Clause, Mr. Hernandez had a right to assistance, or at least at a minimum, to further inquiry by the immigration judge as to his actual mental capacity or incapacity. With respect to the statutes and regulations, the immigration and nationality, yes? I believe there was also one exchange where Mr. Hernandez seemed to say that he didn't need counsel, but again, that exchange, I think, Your Honor, again, illustrated Mr. Hernandez's failure to understand the proceedings against him, because when the immigration judge asked him about getting counsel, and he seemed to say he didn't want it, and the immigration judge pressed him on it, he said, I don't need a lawyer. I'm not charged with anything. And the immigration judge said, you still don't understand. So I think that exchange about getting counsel only adds to the evidence in the transcript of Mr. Hernandez's incapacity. So what should the IJ have done? Well, I think the immigration judge should have gotten some kind of assistance from Mr. Hernandez. So he should have on his own then ignored Mr. Ruiz's statements and appointed counsel for him, at least to examine into his competency? Well, again, Your Honor, I think that one exchange that I was referring to before where Mr. Hernandez might have appeared to be declining counsel itself reflected his lack of understanding. And what your answer is, yes, notwithstanding what Mr. Hernandez Ruiz, after being fully advised of his right to get counsel, there were continuances to allow him to do so, he didn't. You're saying that this record is so compelling that as a matter of essentially due process that the judge was obliged to appoint counsel. That's correct, Your Honor. Or if not counsel, again, some form of assistance that would have helped Mr. Hernandez understand the proceedings against him. The statutes and the regulations make reference not only to counsel but to next friends or somebody else who could have been of assistance. Again, at a minimum, in terms of inquiring into Mr. Hernandez's mental capacity, if the immigration judge had inquired with DHS about what was going on with Mr. Hernandez in confinement, at least according to the pro se brief that Mr. Hernandez filed with the BIA, he was being treated in custody with antipsychotic drugs, something that the immigration judge would have learned if he had inquired with the custodian. Did the immigration judge advise him of the organizations that provide pro bono assistance to people with immigration problems? I don't think there's any reference in the record to specific organizations, Your Honor. I don't know whether in suggesting that Mr. Hernandez seek a lawyer, he may have made some general reference to their BIA organizations. Are you appearing pro bono here? I am, Your Honor. And is that through our program? Yes, it is, Your Honor. We appreciate it. We noticed you both came out from Washington, D.C. I talk weather, I know that brings you out here. But when I was in, when I clerked in the last century for Judge Wright, the papers of Robinson had come down. And that's where the district court, observing irrational behavior of a defendant, has a constitutional obligation to reach out to the district court. And that was the point of counsel and the like, and that was the heyday of Judge Bazelon and Judge Wright's concerns about St. Elizabeth's and the like. The point of all that is that there was a D.C. bar which had a panel of lawyers who, of all the firms, partners, associates and the like, who were subject to and had volunteered to be subject to appointment as counsel. Is there any such thing available in D.C. now? Or this proceeding didn't happen in D.C., though, is that correct? Correct, Your Honor. I believe it happened in San Diego. San Diego, okay. So does D.C. have that? I think that the U.S. District Court has such a panel generally, but not as... For immigration cases? I'm not aware of any cases. I don't know about San Diego. Do you know about San Diego, whether it has... I do not. I know that there are non-profit organizations scattered around, certainly, that do try to assist people. Okay. Was that Skelly Wright? Yes. I'll give you a little history. Yes. My law partner... I'm sorry for raising my hand. My law partner went to, I think, Alsace-Fortier High School in New Orleans. And Skelly Wright, during the Depression, was his English teacher. And Judge Bazelon's granddaughter was my law clerk. She's now a public defender. Very good, Your Honor. His other granddaughter is on National Public Radio all the time. Uh-huh. Well, I... We certainly think that Judge Wright was a great jurist, and that his approach in that case is a good one. In this case, again, applying... No, they don't have too many people like that around anymore. Yes. Well, I see I'm actually over my time. We're talking about the East Coast. Maybe I can just reserve one minute for rebuttal. I think we should allow you. We've used up a lot of your time. Thank you. We do appreciate your participation in the pro bono program. Thank you, Your Honor. Good morning. Kate DeAngelis for the government. The issue before the Court today is whether the I.J. erred in finding that Mr. Hernandez was inadmissible based on his commission of a crime involving moral turpitude. To focus on the petty offense exception, why isn't that clearly wrong on the I.J.'s part? Well, the petty offense exception only applies when the maximum sentence is not greater than one year. And he was... Petitioner was actually served more than six months in jail on this offense. He was originally sentenced to six months. He violated his probation and served... In addition to that, the I.J. didn't talk about the subsequent sentence. He talked about the basic underlying sentence, right? Well, and the underlying sentence was a suspended sentence as well in addition to the original jail sentence. And under California law, that translates out into converting the wobbler to a misdemeanor. Well, under the I.N.A., a sentence that is suspended is actually considered as time sentence, so it would come outside of the petty offense exception. He was under, I believe it's I.N.A. 101-A-48. Sentences that are suspended count towards sentence time. And that would be the situation here. So what, you give him six months? Well, and he had a suspended sentence in addition to the six months. Well, the penalty sentence was six months. No, he served six months. He had a three-year state prison suspended sentence, and then he served another six months and 30 days in jail following probation violations related to this conviction. So he's well outside of the petty offense exception. I'd also like to note up front that... Well, but you look at the time he served in the county jail. He ended up serving one year plus one month in the county jail. Well, I don't think you can add in that probation violation that occurred later. Well, it was a probation violation that was related to the original conviction. Well, I know we've got some cases under the sentencing guidelines where there's a probationary violation, and then the argument was that you've got to add that period on to the sentence the person received. And if you do that, then this is a sentence beyond the statutory limits. So that means that there should have been a jury determination, and they said, no, it doesn't work that way. Well, Your Honor, if I may, the original sentence, the time actually served is really irrelevant because the original sentence contained a suspended sentence as well. It contained a three-year suspended sentence. Clearly, suspended sentences on wobblers are treated as felonies, especially when no subsequent action by the court is taken to designate it as a misdemeanor. And furthermore, as I noted under the INA, suspended sentences... We treat them, whether they're a wobbler or not, we treat them by the amount of time spent in the county jail. Well, you know, two arguments there, one that the suspended sentence counts for INA purposes, and the second one that he ended up serving more than a year in county jail based on this conviction. I'd like to point out that Petitioner misapprehends the government's burden here as well. For inadmissible aliens, the alien has the burden of showing by clear and convincing evidence that he is, in fact, admissible. The government's burden is simply to show some evidence that the alien has been convicted. And in this case, the government has both the admission of Mr. Hernandez Ruiz himself and it has, as Petitioner's counsel noted, has the rap sheet showing that the conviction did exist. So the burden shifts to the alien to show by clear and convincing evidence that he wasn't convicted of this crime and that it doesn't disqualify him for relief. And he makes no attempt to do that, instead relying on the government, you know, arguing that the government hasn't submitted sufficient evidence. Well, but was there a certified copy of the judgment of conviction? No, there is not in the record. There's a certified record from the state of California showing that he was convicted under California Appeal Code 273.5. And there is Petitioner's own admission. You say there is or is not? Well, there's not a judgment, a certified judgment. It's the certified state criminal history report. It's a rap sheet. It's a rap sheet. Yeah, a rap sheet. Right. But we would submit that the rap sheet in itself, especially coupled with the Petitioner's admission in an immigration court hearing that he was convicted of this crime, is certainly enough to meet the government's burden to show some evidence of the conviction and to shift the burden then to the alien who's here in admissibility proceedings, not deportation proceedings. I'm looking at ER 184, and it says the original sentence was 36 months probation, 6 months jail. That was the original sentence, correct? Sorry, could you give me the AR site? 184. Yes, that is correct. I apologize. That was my mistake. The 3 years prison suspended came in December 19th, 2000. So his original sentence did not convert this to a felony. But you have to rely on the notion that somehow when he came back on probation, is that what the IJ relied on? Well, first of all, it's noted as a felony on the record, which the Petitioner acknowledged. But the California law is pretty clear as to what is actually done is what makes this either a felony or a misdemeanor, because they are wobblers. Right. And our case law, as I read it, says that we look to what California would do, and the original sentence was 6 months in jail. I don't have to say anything about he was sent, because I understand suspended sentences, and that if that had been the original sentence, your argument may well have been the case. But that's not what was. And ultimately he was given 6 after the probation reinstatement, that there's the 3 years prison suspension. Right, right.  I don't understand your argument. Okay. Well, our argument is that the probation violations all fell under the same conviction. He violated his probation. His ultimate sentence here was over 1 year in time served and 3 years suspended. And there was no action taken to designate this as a misdemeanor after the probation violations and after he went back and served that extra time. Well, the burden is really on you to prove it, not for him. Well, you know, the burden is on Petitioner to show up, you know, to prove that he does qualify for the petty exception. I understand, but you're relying on the rap sheet. That's all you've got as to what, and you're saying, well, there's no M written on anything. It's always an F. I don't think that, given what the verbal, the written description of what he actually got, is what really controls for purposes of California law. Well, Petitioner, in terms of meeting his burden of showing that he is admissible to the United States, has submitted no evidence whatsoever to show that he, you know, anything about the character of his conviction. So, you know, I would submit that he hasn't met his burden of showing by clear and convincing evidence that he is admissible to the United States. My time is dwindling. Could you address the issue of what the IJ should have done here, given the fairly clear evidence that this fellow was having a lot of trouble understanding what was going on? Well, certainly I would disagree with the notion that Petitioner exhibited any mental disability. Setting that aside, I'll take your point on that. I'm more interested in whether there is a process that should have been followed. Let's assume that he did exhibit enough. Okay. What was open to the IJ to do then, notwithstanding he had said you should get counsel and the like? Petitioner does not have a right to have counsel appointed to him. I understand you don't have a right. The immigration judge, in the government's opinion, did everything he could to clearly explain the charges before Petitioner. That's not my question. I'm agreeing on that. Okay. What was available to the IJ to do, assuming that the Petitioner was, in fact, mentally incompetent? Well, to my knowledge, what was available to the IJ to do is what he actually did. Just tell him that he should go get an attorney? Several times. At several hearings, tell him, I suggest that you appoint an attorney. He told him this is— So if the guy is really mentally incompetent, doesn't understand a thing about what's going on, doesn't avail himself of the fact that there's a provision dealing with mental incompetency in the regulations, he doesn't have to do anything. If that were the case, in this case, which it clearly is not in the government's opinion, if that were the case, under the regulations, I believe it's 8 CFR 1240, the IJ would need to serve the—if he's detained, he would need to serve the warden or whatever that position is of the facility where Petitioner was being detained. And he is to inform the Petitioner that he has the right to be helped in his proceedings by a spouse, a family member, and he should urge that. But there's no requirement for the judge to, for example, hold a competency hearing as there would be in a civil proceeding. There's no requirement for the judge to appoint counsel. So in this case, you know— I understand this case. I'm trying to understand what the government's position is of what happens. Well, that would be— So you get a really wacko person. Or it doesn't even have to be wacko. I mean, we've had a case where there was an elderly Armenian woman who was clearly not understanding anything on the record. And her daughter showed up, so. Well, you know, I can't really speculate as to what, you know, the immigration court should have done. I'm talking about process. What is the process? Well, you know— There is none. There's no process. Right. The alien does not have a right to an appointment of counsel. And, you know, beyond that, I— Yeah. Rights aside, I think what Judge Fischer is asking is, assuming the judge in this case wanted to do something, what could he have done? Is there some procedure in place to provide for competency evaluation, et cetera? And I think the answer is there is none. Correct? As far as you know. As far as I know, there is none. Yes. All right. Okay. We're going to recess or take a break. Thank you both. We'll be back. Thank you. Thank you.  Okay.  I'm fine. I'm not going to interrupt. Alan? Mike, come here. I can't see Mike. You bet. Yeah. I'm living in L.A. Yeah.
judges: Pregerson, Hawkins, Fisher